# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 1, 2016

## IN RE SCOTT H.

**Appeal from the Juvenile Court for Shelby County**
**No. X5881    David S. Walker, Special Judge**

---

**No. W2016-00070-COA-R3-PT – Filed September 30, 2016**

---

This is a termination of parental rights case involving a ten-year-old child, Scott H. ("the Child"). On August 8, 2011, the Shelby County Juvenile Court ("trial court") granted temporary legal custody of the Child to the Tennessee Department of Children's Services ("DCS"). The Child was immediately placed in foster care, where he has remained since that date. DCS subsequently filed a petition to terminate the parental rights of the Child's mother, Jill H. ("Mother"), and his father, William H. ("Father"), on April 17, 2015.[1] Following a bench trial, the trial court terminated Mother's parental rights to the Child after determining by clear and convincing evidence that (1) Mother failed to substantially comply with the requirements of the permanency plans, (2) the conditions that led to the removal of the Child from Mother's custody still persisted, and (3) Mother was mentally incompetent to adequately care for the Child. The trial court further found by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child. Mother has appealed. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Johnna I. Duke, Memphis, Tennessee, for the appellant, Jill H.[2]

Herbert H. Slatery, III, Attorney General and Reporter, and W. Derek Green, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

---

[1] Father, whose parental rights to the Child were also terminated by the trial court, is not participating in this appeal.

[2] We note that in its judgment, the trial court listed "Jill B." as a prior name for Mother. Inasmuch as the trial court referred to Mother as "Jill H." throughout its judgment, we will refer to Mother as Jill H. or Mother for purposes of this Opinion.

Sharon G. Lichliter, Germantown, Tennessee, Guardian Ad Litem.

**OPINION**

I. Factual and Procedural Background

Prior to the Child's removal from the parents' home on August 8, 2011, DCS received a referral in April 2011 alleging psychological harm to the Child and his siblings. At the time of the referral, the Child was admitted to the intensive care unit at LeBonheur Children's Medical Center for complications resulting from a seizure. The Child has a severe seizure disorder, autism, uses a wheelchair, and requires that several medications be administered to him precisely on a daily basis in order to maintain physical and mental stability. Hospital personnel and DCS had concerns at that time that Mother was unable to properly administer the Child's medications.

As a result of the referral, DCS established service providers to work with the parents in the parents' home. The Child was subsequently placed in foster care on August 8, 2011, by order of the trial court, due to "the lack of participation and insignificant progress that the children were making [in] the care of the parents" and additional concerns regarding both Mother's and Father's mental health.[3] In its Protective Custody Order, the court found as follows in pertinent part:

> The nature of the emergency that indicates an immediate threat to the children's health is the parents' lack of concern with the lack of progress [of] the children in the home. The parent[s'] negligence with meeting the immediate needs of [the Child] and [L.H.] is also extremely concerning, and they are leaving [K.H.] (who is nine years old) with the responsibility of medicating his younger brother [the Child]. The children have not made any progress in the care of the parents and their individual issues are getting progressively worse. The children are more delayed than they should be given the multitude of issues they have. . . . Also, the mother is diagnosed with mood disorder and is [intellectually disabled], which further causes concern that the children are not being cared for properly in the home.[4]

---

[3] The Child has two siblings, L.H. and K.H., who were also placed into DCS custody on August 8, 2011. L.H. was six years old and K.H. was nine years old at the time the children were removed from the parents' custody. Those siblings were released into the custody of relatives during the pendency of the case. Due to the special needs of the Child, the relative caregivers were unable to assume custody of the Child.

[4] We note that our Supreme Court has urged the use of "intellectual disability" whenever possible to avoid negative stereotypes and potentially hurtful terminology. *See Keen v. State*, 398 S.W.3d 594, 600

The court adjudicated the Child as dependent and neglected on January 27, 2012. At that time, the court found that it was not reasonable for DCS to make efforts to maintain the Child in the home due to the psychological harm to the Child and his siblings while in the custody of the parents and the parents' failure to provide appropriate parenting and counseling for the Child to address his special needs. The Child remained in foster care during the pendency of the case.

Upon the Child's placement into the custody of DCS, permanency plans were developed for the Child on August 22, 2011; February 22, 2012; February 13, 2013; February 7, 2014; and March 23, 2015. In the initial permanency plan created on August 22, 2011, and ratified on September 8, 2011, DCS listed a goal of "Return to Parent." A permanency plan developed on February 22, 2012, and ratified on September 17, 2012, included the same goal as the previous plan. In the permanency plan dated February 13, 2013, and ratified on August 5, 2013, DCS amended the permanency plan goals regarding the Child to include "Adoption" or "Exit Custody with Kin." The permanency plan dated February 7, 2014, was ratified on August 9, 2014, and included the same goals as the previous plan. In the March 23, 2015 permanency plan, ratified on September 14, 2015, DCS listed "Adoption" as the only goal. The permanency plans required Mother to (1) care for the Child effectively and successfully by providing him with a safe environment; (2) ensure that the Child was bathed, had clean clothing, and was at school on time; (3) ensure that the Child's appointments were timely scheduled and his medications timely filled; (4) properly administer the Child's medications; (5) understand the Child's medical needs; (6) complete parenting classes; (7) demonstrate an ability to care for and meet the Child's needs; (8) care for herself effectively and successfully by attending all mental health appointments and making consistent progress; (9) provide verification of her mental health treatment; (10) follow the recommendations of psychological assessments; (11) visit with the Child; and (12) pay child support. DCS filed a petition to terminate parental rights on April 17, 2015.

DCS case manager Dakshanique Gary was assigned to this case on January 3, 2012. Ms. Gary testified at trial that the most important task on the permanency plan was for Mother to attend the Child's medical appointments and demonstrate an understanding of the Child's medical diagnoses and the proper administration of the Child's medications. Ms. Gary noted that receiving a proper dosage of medications was essential for the Child to survive. According to Ms. Gary, DCS worked with Mother for four years after the Child was placed into DCS custody on August 8, 2011. Since the Child had been in custody, Mother had completed a mental health assessment, parenting classes,

n.6 (Tenn. 2012) (citing the Tennessee General Assembly's 2010 amendment to Tennessee Code Annotated § 39-13-203); *In re Christopher S.*, No. E2012-02349-COA-R3-PT, 2013 WL 5436673, at *3 n.1 (Tenn. Ct. App. Sept. 27, 2013).

3

and a psychological evaluation. Mother continued to visit the Child during the case and maintained housing.

Ms. Gary further testified that DCS placed Youth Villages, a service provider, into Mother's home for over a year. As explained by Ms. Gary, although Youth Villages is only intended to provide services in a home for thirty to ninety days, Youth Villages had worked with Mother for over a year to exhaust their efforts. Youth Villages provided assistance to Mother with parenting a special-needs child and training on methods to properly administer the Child's medications. During one visit, Mother was to complete an exercise and demonstrate how to administer the Child's medications using a bucket of water and a dropper. During the exercise, however, Mother was able to successfully perform the technique only one out of five times with assistance. Youth Villages also worked with the parents to recognize the Child's seizure symptoms, which included turning his foot inward, losing his balance, and "staring off."

For additional assistance, DCS provided Mother with a calendar containing dates, times, and locations of the Child's medical appointments. Ms. Gary also indicated that she arranged for the foster parents to meet Mother at a neutral location so that she could follow them to the Child's medical appointments. As Ms. Gary explained, Mother missed several of the Child's medical appointments, claiming that she did not know the location or had confused the times of the appointments. According to Ms. Gary, when Mother did attend the appointments, she became irate if the physician referred to the foster mother as the Child's mother. Ergo, the appointments became counterproductive for Mother. Ms. Gary also related that while she informed Mother of an available class for parents of children diagnosed with autism, Mother did not attend. Although that class was not specifically required by the permanency plan, the instruction could have been helpful to Mother in understanding the Child's medical condition. According to Ms. Gary, Mother had not demonstrated that she understood the Child's medical needs by the time of trial and had further not demonstrated that she could properly administer the Child's medications. As Ms. Gary indicated, Mother never demonstrated any parenting skills that she had learned from the parenting classes during visits with the Child.

During the pendency of the underlying dependency and neglect action, Mother and Father were afforded unsupervised visitation together with the Child when Father was able to demonstrate an ability to administer the Child's medications.[5] Ms. Gary testified that, despite Father's progress, Mother had failed to demonstrate an ability to administer the Child's medications. By virtue of the parents' cohabitation, unsupervised visitation with both parents participating began. Following the commencement of unsupervised

---

[5] The unsupervised visitation was provided for the parents jointly. As the parents resided together, the unsupervised visits took place at their home. Although Mother had not demonstrated an ability to administer the Child's medications, Father in fact had.

visits, concerns arose due to the Child's physical appearance. According to Ms. Gary, the Child returned from the unsupervised visits soiled, dirty, pale, and "a little bit off balance." Consequently, the foster parents became concerned and took the Child to his primary care physician. Medication levels in the Child's blood were tested prior to an unsupervised visit and again following the visit. Testing showed that the Child's levels were within an acceptable range on the Friday morning before he departed for the respective unsupervised visit. Subsequent blood testing performed after the Child returned from the visit, however, demonstrated a significant decline of the medications in the Child's system. According to Ms. Gary, the blood testing evinced that the Child was not receiving the proper medications during the unsupervised visits, resulting in the Child's decline in health by the time he returned to the foster home. Mother claimed that she and Father had administered the Child's medications correctly. Subsequently, the unsupervised visits ceased.

On December 22, 2014, Mother underwent a psychological evaluation performed by LaShaunda P. Massey, Ph.D. At trial, Dr. Massey was qualified to testify as an expert clinical psychologist in the area of child neglect without objection. In her evaluation, Dr. Massey recognized a "disconnect between [Mother's] desires and true abilities." According to Dr. Massey, Mother failed to "recognize her limitations and tend[ed] to minimize problems in her functioning." Dr. Massey observed that Mother had a "very superficial level" of understanding regarding the Child's medical condition and the reasons the Child was removed from her home. Testing established that Mother had a functional intelligence quotient of 75, which Dr. Massey described as being "at the 5th percentile indicating that [Mother's] level of functioning is below that of 95% of her same-aged peers." According to Dr. Massey, this score suggested that Mother would "have difficulty understanding complex information and functioning in a manner expected of someone her chronological age." Dr. Massey further opined that Mother genuinely believed she had provided adequate care for the Child and had not intentionally neglected him. Mother did not complete the anger assessment form, but a parenting measure demonstrated that Mother was "at risk for using overly harsh disciplinary strategies . . . ."

Dr. Massey diagnosed Mother with Mood Disorder, not otherwise specified, and Borderline Intellectual Functioning. Dr. Massey opined that Mother would "not make any significant gains in cognitive functioning over time." Dr. Massey concluded:

Despite her love for her children and her desire to reunite her family, [Mother] does not have the capacity to parent independently or to co-parent effectively with [Father] based on her borderline level of intellectual functioning, limited adaptive functioning skills, and problems with emotional regulation. [Mother] has limited insight in regards to her

functional limits and that is an additional barrier to her appropriate functioning. [Mother] has demonstrated limited understanding of [the Child's] significant problems and medical needs. She has not learned to properly administer his medication. Returning [the Child] to her care would place this medically fragile child at risk.

Based on the results of the psychological evaluation, Dr. Massey concluded at trial that Mother was not able to adequately parent the Child. Although Dr. Massey recommended in her evaluation that structured, supervised visitation continue with Mother and the Child, Dr. Massey testified that ongoing supervised visitation would not likely lead to reunification of the Child with the parents.

In addition, Ms. Gary testified that Mother was easily agitated, explaining that Mother assaulted Father during a meeting at DCS. Ms. Gary further testified regarding an assault by Mother upon an agency worker with Youth Villages. Mother made several outbursts during the trial, resulting in continual reminders from the trial court that Mother remain calm. Ultimately, the trial court ordered Mother removed from the courtroom at the end of the proceeding.

Ms. Gary also articulated that the Child's behavior had improved since being placed into foster care. The Child was now doing "extremely well" and was in a pre-adoptive foster home. According to Ms. Gary, the Child maintained a strong bond with the foster parents. Although the Child recognized Mother and was happy to see her, Ms. Gary did not believe that the Child and Mother were bonded. Instead, Ms. Gary opined that visits with Mother were harmful to the Child as the Child would, at times, become upset during visits and "shut down."

During trial, the Child's foster mother testified at length regarding the severity of the Child's seizure disorder, the treatment required for his medical condition, the accommodations she had made with the Child in her home, and the Child's significant progress she had observed. The foster mother related that the Child was required to take numerous medications, including anti-seizure medications, behavior-modification medication, and blood pressure medication. As explained, although the Child suffered mild seizures daily, major seizures had stopped since he had "leveled out on his medications." When questioned, the foster mother elaborated that although she and her husband would love to adopt the Child, they intended to allow him to continue to see his biological siblings and possibly his biological parents, so long as those visits were successful for everyone.

The trial was conducted on October 29, 2015, before Special Judge David S. Walker. Mother was present for trial. The record contains no appointment order signed

by the trial court judge appointing attorney David S. Walker as a special judge for this case. No party objected at trial to Mr. Walker presiding over the case as a special judge.

Following the trial on the merits, the trial court entered a final order on December 3, 2015, terminating Mother's parental rights to the Child. As pertinent to this appeal, the court found by clear and convincing evidence that (1) Mother failed to substantially comply with the requirements of the permanency plans, (2) Mother was mentally incompetent and unable to care for the Child, and (3) the conditions leading to the Child's removal from the home still persisted. The trial court further found by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child. Mother timely appealed. During the appeal, this Court requested that the parties file supplemental briefs addressing Mr. Walker's authority to preside over this matter. Mother, DCS, and the guardian *ad litem* filed supplemental briefs, with each respectively concluding that Mr. Walker had lawful authority to preside over the trial.

## II. Issues Presented

Mother presents four issues for our review, which we have restated as follows:

1.  Whether the trial court erred by terminating Mother's parental rights based on the statutory ground of substantial noncompliance with the permanency plans.

2.  Whether the trial court erred by terminating Mother's parental rights based on the statutory ground of mental incompetence to adequately care for the Child.

3.  Whether the trial court erred by terminating Mother's parental rights based on the statutory ground of persistence of conditions leading to removal of the Child.

4.  Whether the trial court erred by determining by clear and convincing evidence that the termination of Mother's parental rights was in the best interest of the Child.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record,

7

accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *see In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has recently explained:

> The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decison terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re*

8

*Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

* * *

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Authority of Special Judge

As a threshold issue, we first address, *sua sponte*, whether the special judge was properly appointed to hear this matter. *See* Tenn. R. App. P. 13(b); *see, e.g., County of Shelby et al. v. City of Memphis et al.*, 365 S.W.2d 291, 291 (Tenn. 1963). If Mr. Walker was not properly appointed as a special judge, we must then determine whether the finality and validity of the trial court's judgment are affected. In her supplemental brief addressing this issue, Mother indicated her acquiescence in the appointment of David S. Walker as a special judge and agreed that Mr. Walker maintained the authority to render a decision as special judge in this cause. Upon our careful review, we conclude that Mr. Walker acted as a *de facto* judge in these proceedings and that the judgment signed by Mr. Walker is valid and enforceable.

In the trial court's judgment, signed by Mr. Walker, apparent boilerplate language[6] was included, which read, as follows:

The Judge finds it necessary to be absent from holding Court, and pursuant to Tenn. Code Ann. 17-2-122(b) appoints as substitute judge, David S. Walker, who is a licensed attorney in good standing with the Tennessee

---

[6] The same language, except for the special judge's name, appears in at least three separate orders in the record signed by special judges. Mother also stated in her supplemental brief that "[s]pecial language is added to the orders issued by the special judge reflecting his/her appointment in the case."

Supreme Court and a Magistrate appointed by him to serve as special judge in matters related to duties as a judicial officer.[7]

The record before us contains no appointment order signed by the trial court judge appointing Mr. Walker as a special judge in this action.[8] Instead, the judgment bears only Mr. Walker's signature for appointment as special judge. Notwithstanding, neither party has challenged the special judge's authority to adjudicate the termination action either in the trial court or on appeal.

Although the absence of an appointment order is a procedural error, the procedural error is not necessarily fatal. *See Ferrell v. Cigna Property & Cas. Ins. Co.*, 33 S.W.3d 731, 739 (Tenn. 2000); *State Dep't of Children's Services v. A.M.H.*, 198 S.W.3d 757, 764 (Tenn. Ct. App. 2006); *In re M.A.P.*, No. W2008-01352-COA-R3-PT, 2009 WL 2003357, at *13, n.11 (Tenn. Ct. App. July 10, 2009). If a judge is acting under the color of law absent bad faith, the special judge may serve as a *de facto* judge, and his/her acts will be binding on the parties. *See Ferrell*, 33 S.W.3d at 739; *M.A.P.*, 2009 WL 2003357, at *13, n.11. In *Ferrell*, our Supreme Court explained that "[a] judge *de facto* is one acting with color of right and who is regarded as, and has the reputation of, exercising the judicial function he assumes." *Ferrell*, 33 S.W.3d at 739 (quoting *State ex rel. Newsom v. Biggars*, 911 S.W.2d 715,718 (Tenn. 1995)). other

During this appeal, this Court *sua sponte* directed the parties to file supplemental briefs addressing whether the special judge was properly appointed to hear this matter and if not, further addressing the validity and finality of the judgment appealed. Mother, DCS, and the guardian *ad litem* each respectively filed briefs concerning this issue. In Mother's supplemental brief, she concludes that "the special judge had the authority to hear the matter and render a decision." DCS and the guardian *ad litem* also assert that the special judge had the authority to preside over the case as special judge.

---

[7] Tennessee Code Annotated § 17-2-122 (2009) provides:

> (a) Notwithstanding § 16-15-209 or § 17-2-109 or any other relevant provision to the contrary, a judge shall have the authority to appoint a special judge as provided in this section.

> (b) Sections 16-15-209 and 17-2-109 and any other relevant provision shall not apply where a judge finds it necessary to be absent from holding court and appoints as a substitute judge an officer of the judicial system under the judge's supervision whose duty it is to perform judicial functions, such as a juvenile magistrate, a child support magistrate or clerk and master, who is a licensed attorney in good standing with the Tennessee supreme court. The judicial officer shall only serve as special judge in matters related to their duties as judicial officer.

[8] The record is otherwise silent as to whether Mr. Walker is a magistrate or other judicial officer.

10

This Court recently addressed a similar issue in *In re Devin B.*, No. W2016-00121-COA-R3-JV, 2016 WL 4520859 (Tenn. Ct. App. Aug. 25, 2016). In that case, this Court explained:

> Relying on *In re M.A.P.*, Father notes that the special judge's "authority was not challenged by any of the parties, and there is nothing in the record indicating that [the special judge] operated in bad faith, and therefore, [the special judge] acted as de facto judge, and the appeal is properly before this [c]ourt." Despite this Court's criticism of the Juvenile Court's method of appointing special judges in 2009 in *In re M.A.P.*, the practice appears to have endured. However, given Father's acquiescence to the practice and the outcome discussed herein, we proceed to address the issues raised by Appellant on appeal.

*Id.* at *3.

Similarly, in the case at bar, Mother has acquiesced in the appointment and asserted on appeal that Mr. Walker had the authority to preside as special judge. Despite the absence of an appointment order signed by the trial court judge, there is no evidence contained in the record that the special judge operated in bad faith. Inasmuch as there has been no objection by any party to Mr. Walker's authority to preside over this matter in the absence of a valid appointment order, we determine that the special judge was acting as a *de facto* judge. Accordingly, the judgment is final and valid. We shall proceed to address the issues raised on appeal.

## V. Grounds for Termination of Parental Rights

Tennessee Code Annotated § 36-1-113 (Supp. 2016) lists the statutory grounds for termination of parental rights, providing in relevant part as follows:

> (a)  The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.
>
> * * *
>
> (c)  Termination of parental or guardianship rights must be based upon:

11

> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of three statutory grounds to terminate Mother's parental rights: (1) substantial noncompliance with the permanency plans, (2) mental incompetence to adequately care for the Child, and (3) persistence of conditions leading to removal of the Child. We will address each statutory ground in turn.

### A. Substantial Noncompliance with the Permanency Plans

Mother contends that the trial court erred by finding clear and convincing evidence that she failed to substantially comply with the reasonable responsibilities set out in the permanency plans. Tennessee Code Annotated § 36-1-113(g)(2) provides as a ground for termination of parental rights:

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]

In its final judgment, the trial court stated specific findings of fact regarding this statutory ground as follows in relevant part:

> Pursuant to Tennessee Code Annotated section 36-1-113(g)(2), [Mother has] failed to comply with the obligations and responsibilities outlined in the permanency plans, though said obligations and responsibilities were ratified by the Court as reasonable and related to the reasons necessitating foster care. Dakshanique Gary testified as to the creation, goal and requirements of the permanency plans dated August 22, 2011, February 22, 2012, February 13, 2013, February 7, 2014, and March 23, 2015. Said permanency plans required [Mother] to care for the child effectively and successfully by providing him with a safe environment; ensure that [the Child] is bathed, [has] clean clothes, and get[s] to school on time[;] ensure [the Child's] appointments are timely scheduled and his medications timely refilled; attend [the Child's] medical appointments; demonstrate an understanding of [the Child's] medical issues and how to

12

care for them; demonstrate an ability to parent the child; understand the child's medical issues; meet the child's needs; care for [herself] effectively and successfully by attending [Mother's] own mental health appointments and tak[ing] prescribed medications consistently; provide verification of [Mother's] mental health treatment; visit and support the child; and follow the recommendations of the psychological assessments. The Court finds that the most important tasks on the permanency plan [were] for [Mother] to demonstrate an understanding of [the Child's] medical conditions and demonstrate an ability to care for them. The Court further finds that despite [DCS's] reasonable efforts to assist in compliance with this task by placing Youth Villages Intercept services in the parents' home to provide assistance with parenting a special needs child; providing the [Mother] with dates of training offered to parents with children who have [a] mental health diagnosis and for parents with children diagnosed with autism; providing [Mother] with a calendar of [the Child's] appointment[s] and arranging for [Mother] to meet the foster parents at a familiar location so that they can trail the foster parents to the appointments[;] and the [Mother's] completion of parenting classes[,] that [Mother has] not demonstrated the ability to comply with this task and care for [the Child's] medical needs. [Mother was] notified that failure to comply with the requirements on the permanency plans could result in the termination of [her] parental rights.

Upon our careful review of the record, we determine that the evidence preponderates in favor of the factual findings by the trial court. Although Mother completed parenting classes and continued to visit with the Child, Ms. Gary testified that Mother had not demonstrated any skills learned during her parenting classes while caring for the Child. The trial court determined that the most important requirements on the permanency plans were for Mother to demonstrate an understanding of the Child's medical condition and to demonstrate an ability to care for the Child's medical condition. Significantly, Mother missed several of the Child's medical appointments, stating that she had confused the locations and times. Although Mother participated in unsupervised visitation for a period of time, the unsupervised visits were discontinued because the Child was not properly receiving his medications.

After four years, Mother was still unable to demonstrate that she understood the Child's medical condition and unable to care for the Child's medical needs. Dr. Massey determined in her psychological evaluation that Mother had only a "very superficial level" of understanding regarding the Child's medical condition. We conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that Mother failed to substantially comply with the requirements of the permanency plans.

B. Mental Incompetence to Adequately Care for the Child

Mother also contends that the trial court erred by terminating her parental rights based upon the statutory ground of mental incompetence to adequately care for the Child. Tennessee Code Annotated § 36-1-113(g)(8) provides as an additional ground for termination:

> (8)(A)   The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;
>
> (B)   The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:
>
>> (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and
>>
>> (ii) That termination of parental or guardian rights is in the best interest of the child;
>
> (C)   In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated[.]

The General Assembly's exclusion of willfulness from this statutory ground "serves to protect children from harm caused by a parent who is incapable of safely caring for them." *See In re D.A.P.*, No. E2007-02567-COA-R3-PT, 2008 WL 2687569, at *5 (Tenn. Ct. App. July 9, 2008). If willfulness were required in order to terminate parental rights for mental incompetence, "an obvious result . . . is to condemn a child, whose parents are unfit to properly care for the child because of mental illness, to a life in serial foster homes without any possibility of a stable, permanent home." *See State, Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990).

14

In its final judgment, the trial court stated specific findings of fact regarding this statutory ground as follows in relevant part:

Pursuant to Tennessee Code Annotated section 36-1-113(g)(8), [Mother is] incompetent to adequately provide for the further care and supervision of the child because [her] mental condition [is] presently so impaired and is so likely to remain so that it is unlikely that [Mother] will be able to assume or resume the care of and responsibility for the child in the near future. Dr. Lashunda Massey, clinical psychologist, testified that she completed a psychological evaluation on [Mother] on December 22, 2014.

Dr. Massey testified that based on her assessment of [Mother] and as recommended in her written psychological evaluation that "despite her love for her children and her desire to reunite her family, [Mother] does not have the capacity to parent independently or to co-parent effectively with [Father] based on her borderline level of intellectual functioning, limited adaptive functioning skills, and problems with emotional regulation. [Mother] has limited insight in regards to her functional limits and that is an additional barrier to her appropriate functioning. [Mother] has demonstrated limited understanding of [the Child's] significant problems and medical needs. She has not learned to properly administer his medication. Returning [the Child] to her care would place this medically fragile child at risk."

(Section and paragraph numbering omitted.)

In determining that Mother was mentally incompetent to adequately provide for the further care of the Child, the trial court relied heavily on Mother's psychological evaluation performed by Dr. Massey. Accordingly, "[w]e may infer the trial court's findings on issues of credibility and weight of testimony from the manner in which the trial court resolved conflicts in the testimony and decided the case." *In re Sidney J.*, 313 S.W.3d 772, 777 (Tenn. 2010). Any credibility determinations by the trial court will be provided great deference on appeal. *See Jones*, 92 S.W.3d at 838. Dr. Massey acknowledged that Mother desired to care for the Child. When questioned at trial, she opined, however, that Mother did not have the mental competency to adequately care for the Child and that Mother's impaired mental condition could not be overcome.

The trial court's determination regarding Mother's mental incompetence is also supported by the unsuccessful, unsupervised visits by Mother. The testimony of Ms.

15

Gary established that the Child returned from these visits soiled, dirty, pale, and "a little bit off balance." Testing of the Child's blood before and after the unsupervised visits with Mother evinced that the Child's medications were not being properly administered during the visits. According to Ms. Gary, an essential element of the Child's medical care is that his caretaker properly administer his medications.

Following a thorough review of the record, we conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that Mother was incompetent to adequately provide for the care and supervision of the Child. Mother's mental condition is presently and is likely to remain so impaired that it is unlikely Mother will be able to assume care of and responsibility for the Child in the near future. Therefore, we affirm the termination of Mother's parental rights based on the statutory ground of mental incompetence to adequately care for the Child.

### C. Persistence of Conditions

Mother further contends that the trial court erred by terminating her parental rights based upon the statutory ground of persistence of conditions leading to removal of the Child. Tennessee Code Annotated § 36-1-113(g)(3) provides as an additional ground for termination of parental rights:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

In its final judgment, the trial court included specific findings of fact regarding this statutory ground as follows in pertinent part:

16

Pursuant to Tennessee Code Annotated section 36-1-113(g)(3), [the Child] has been in the custody of the State of Tennessee, Department of Children's Services for more than six (6) months preceding the filing of this petition, and the conditions which led to removal still persist and other conditions exist which in all probability would cause the child to be subjected to further abuse and neglect and which, therefore, prevent the child's safe return to the care of [Mother]. Further, there is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to [Mother] in the near future; the continuation of the legal parent and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; and continuation of the legal parent and child relationship is not in said child's best interest.

As the record reflects and the trial court found, the Child was removed from the custody of Mother on August 8, 2011, due in part to psychological harm to the Child and his siblings and also by reason of Mother's mental condition, which had resulted in Mother's inability to care for the Child. The trial court adjudicated the Child to be dependent and neglected on January 27, 2012, at which time the trial court also found that "it was reasonable not to make efforts to maintain the child in the home due to psychological harm to the child while in the custody of his parents and that the parents have failed to provide appropriate parenting and counseling for the child to address his special needs."

Despite Mother's genuine desire to care for the Child, she has failed to demonstrate an ability to care for the Child and his medical condition during the four years the Child has been in state custody prior to trial. As we have already determined in this Opinion, the evidence preponderates in favor of the trial court's findings that Mother's incapacity rendered her mentally incompetent to care for the Child and that Mother had not demonstrated an ability to care for the Child's medical condition in compliance with the permanency plans. Dr. Massey determined in her evaluation that Mother is unable mentally to care for the Child and that it is unlikely Mother would be able to overcome this obstacle to a level where she would be able to care for the Child. Continuation of the parent/child relationship would therefore greatly diminish the Child's chances of integration into a safe and stable, permanent home.

This Court has previously determined that the ground of persistence of conditions can be based on a parent's mental incapacity. *See In re B.S.G.,* No. E2006-02314-COA-R3-PT, 2007 WL 1514958, at *7 (Tenn. Ct. App. May 24, 2007) ("A parent's mental incapacity can provide a sufficient factual predicate for a finding that persistent unremedied conditions exist which prevent the safe return of the child or children to that

17

parent's care."). Following a thorough review of the record, we conclude that the evidence supports the trial court's determination that DCS has proven the ground of persistence of conditions by clear and convincing evidence. The trial court properly terminated Mother's parental rights based on this statutory ground.

## VI. Best Interest of the Child

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 507, 523 (Tenn. 2016) ("'The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.'") (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010)). Tennessee Code Annotated § 36-1-113(i) (Supp. 2016) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)    Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)    Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)    Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)    Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

18

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

The trial court made the following findings of fact concerning the best interest analysis in pertinent part:

Pursuant to Tennessee Code Annotated section 36-1-113(i)(1), the Court finds termination of parental rights is in the best interest of [the Child] in that [Mother has] failed to make such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in [her] home.

Pursuant to Tennessee Code Annotated section 36-1-113(i)(2), the Court finds termination of parental rights in the best interest of [the Child] in that [Mother has] failed to effect a lasting adjustment after reasonable efforts were made by [DCS] for an extended period of time and that lasting adjustment does not appear reasonably possible.

The Court notes pursuant to Tennessee Code Annotated section 36-1-113(i)(3) that [Mother has] maintained regular visitation with the child and that there is no dispute that [she] love[s her] child.

Pursuant to Tennessee Code Annotated section 36-1-113(i)(4), the Court finds termination of parental rights in the best interest of [the Child] in that a meaningful relationship has not been established between [Mother] and the child.

Pursuant to Tennessee Code Annotated section 36-1-113(i)(5), the Court finds termination of parental rights in the best interest of [the Child] in that a change of caretakers and physical environment is likely to have a traumatic effect on the child's emotional, psychological and/or medical condition. The Court specifically finds that this factor weighs heavily in this case as a failure of the child's caretaker to provide adequate care for the child would cause grave danger.

Pursuant to Tennessee Code Annotated section 36-1-113(i)(6), the Court finds termination of parental rights in the best interest of [the Child] in that [Mother] has shown physical and emotional abuse towards [Father].

Pursuant to Tennessee Code Annotated section 36-1-113(i)(7), the Court finds termination of parental rights in the best interest of [the Child] in that the physical environment of [Mother's] home[] is not healthy and safe. The Court notes that the foster mother testified about the great lengths she undertook to provide a safe home for [the Child] and the Court finds such undertakings would be overwhelming for [Mother].

Pursuant to Tennessee Code Annotated section 36-1-113(i)(8), the Court finds termination of parental rights in the best interest of [the Child] in that [Mother's] mental status would be detrimental to the child and prevent [Mother] from effectively providing safe and stable care and supervision for the child. The Court finds that this factor weighs heavily in favor of termination.

The Court is not making a best interest finding pursuant to Tennessee Code Annotated section 36-1-113(i)(9), as no testimony was presented regarding [Mother's] payment of child support.

(Section and paragraph numbering omitted.)

20

The trial court thus found that all statutory factors weighed in favor of terminating Mother's parental rights, except for factor three regarding visitation, which Mother had maintained, and factor nine regarding child support, which did not apply. *See* Tenn. Code Ann. § 36-1-113(i). We agree. The trial court found that Mother was mentally incompetent to safely care for the Child, notwithstanding four years of efforts by DCS and service providers. According to Dr. Massey, Mother's mental condition could not be overcome such that she would be able to care for the Child. The Child's autism and severe seizure disorder demands a caretaker who is able to properly administer his medications. The trial court also considered the guardian *ad litem*'s recommendation that Mother's parental rights to the Child be terminated.

According to Ms. Gary, the Child was thriving with his foster parents, who intended to adopt him. The foster mother elaborated regarding the Child's medical conditions, describing how her family was able to care for him. The trial court recognized the "great lengths [the foster mother] undertook to provide a safe home for [the Child]" and further found that "such undertakings would be overwhelming for [Mother]." The court further emphasized that the change of caregiver and physical environment would have a detrimental effect on the Child because "failure of the child's caretaker to provide adequate care for the child would cause grave danger." The trial court recognized that Mother loved the Child but ultimately determined that termination of Mother's parental rights was in the Child's best interest.

The record demonstrates that the trial court properly analyzed the factors in Tennessee Code Annotated § 36-1-113(i) when determining that termination of Mother's parental rights was in the best interest of the Child. Following our thorough review of the record, we conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest.

## VII. Conclusion

For the foregoing reasons, we affirm the trial court's judgment terminating Mother's parental rights to the Child. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below. Costs on appeal are assessed to the appellant, Jill H.

_____
THOMAS R. FRIERSON, II, JUDGE

21